CARMODY v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Second Department. October 13, 1911.)

1. RAILROADS (§ 282*)—INJURIES TO TRESPASSER—PRESUMPTION AND BURDEN OF PROOF.

In an action by a young man against a railroad company, where it is alleged that the plaintiff, while a trespasser stealing a ride on a freight train in violation of statute, was kicked by defendant's conductor from a hold on a car, so that he fell under the train and was injured, the road is entitled to the benefit of every fact that can have any legitimate bearing upon the nature of the transaction, and it should be accorded the benefit of every principle or rule of evidence that has any tendency to aid in its defense, and the plaintiff must establish his case by a fair preponderance of evidence, and, where the weight of evidence is against the verdict for plaintiff, there is a failure to meet this condition, and plaintiff is not entitled to recover.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 282.*]

2. RAILROADS (§ 282*)—INJURIES TO TRESPASSER—WEIGHT AND SUFFICIENCY OF EVIDENCE.

In an action against a railroad by a young man for personal injuries alleged to have been caused by being kicked by defendant's conductor from a hold on a freight car, on which he was stealing a ride in violation of statute, so that he fell under the train, held, that a verdict for plaintiff should be set aside as against the clear weight of the evidence.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 282.*]

3. NEW TRIAL (§ 104*)—NEWLY DISCOVERED EVIDENCE—SUFFICIENCY AND PROBABLE EFFECT.

Under the rule as to burden of proof established in cases where a trespasser seeks damages for personal injuries inflicted by trainmen while stealing a ride on a freight train, the defendant, where, in view of its information, it would hardly expect an action on the theory disclosed by plaintiff's testimony, although not diligent in producing all the evidence which might have been brought to controvert plaintiff's case, is fairly entitled to the benefit of newly discovered evidence, even though it might be said to be cumulative.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 218–220; Dec. Dig. § 104.*]

Appeal from Trial Term, Nassau County.

Action by Michael Carmody, an infant, etc., against the New York Central & Hudson River Railroad Company. From a judgment in favor of plaintiff and from orders denying a new trial, and a motion to set aside the verdict, defendant appeals. Judgment and orders reversed, and new trial granted.

Argued before JENKS, P. J., and THOMAS, CARR, WOODWARD, and RICH, JJ.

I. R. Oeland, for appellant.

Herbert N. Warbasse, for respondent.

WOODWARD, J. The plaintiff, a carpenter's apprentice, about 20 years of age, lost his right leg from about four inches below the knee and his left foot in an accident upon the defendant's railroad on the 25th day of September, 1910. He was at the time of the accident engaged in stealing a ride upon one of defendant's freight trains at or

near 129th street, in the borough of Manhattan, and two radically different theories of the accident were presented to the jury. The plaintiff's theory was that the plaintiff had succeeded in catching on to the defendant's freight train while at 131st street; that he climbed up between the third and fourth cars from the engine on a train consisting of 41 cars; and that when he had reached a point where he was holding on to the iron handrail at the top of the car, about to climb upon the top of the car, the conductor of the train appeared from the rear end of the train, stepped over upon the car where the plaintiff was holding on to the rail, his face toward the engine, and began kicking the plaintiff's fingers, forcing him to let go and to fall between the cars, with the result above stated. The defendant's theory of the accident was that the plaintiff attempted to get on to the train at the crossing of 129th street, in company with some other boys; that while the plaintiff was running alongside of the train, in the direction in which the train as moving, looking over his shoulder for an opportunity to grab the handrail at the side of the car, another boy ran in front of him, intent upon the same object, and, the two coming together, the plaintiff was tripped and he fell under the wheels, producing the injuries for which the plaintiff has a verdict of the jury for $40,000. The defendant made the usual motion to set aside the verdict under the provisions of section 999 of the Code of Civil Procedure, and subsequently moved the court for a new trial, upon the ground of newly discovered evidence, and from the order entered, denying the motion, the defendant appeals to this court. An appeal is likewise taken from the judgment and order denying defendant's motion to set aside the verdict.

Practically the only question raised on the appeal from the judgment is that the verdict is against the weight of evidence, and, as both of the appeals are to be considered together, it is proper first to look into the evidence to determine whether this point is well taken.

[1] In considering a similar case the court pointed out that the plaintiff was in the act of violating a penal statute, and that the defendant railroad company owed him no duty except not to wantonly injure him, and in discussing the rights of the defendant the court say:

"This case, it seems to me, will furnish a precedent for a new class of actions under the law of neligence, since any one, however careless or reckless, may, in defiance of the statute, board a railroad freight train, and when the conductor undertakes to remove him, unless he uses all the circumspection and gentleness possible, the party removed may, upon his own testimony, recover against the railroad. We do not mean to say that this court can always prevent such results, since the questions are in their nature questions of fact, to be determined at the trial and by the verdict of a jury. All that we mean to say now is that, when a railroad company attempts to defend itself in a court of justice against such a claim as this, it is entitled to the benefit of every fact and circumstance that can have any legitimate bearing upon the nature of the transaction, and it has the right to be accorded the benefit of every principle or rule of evidence that has any tendency to aid in its defense." Barrett v. N. Y. C. & H. R. R. R. Co., 157 N. Y. 663, 667, 52 N. E. 659, 660.

One of the rules of evidence is that the plaintiff shall establish his case by a fair preponderance of evidence, and, where the weight of evidence is against the verdict of the jury, there is a failure to meet

this condition, and the plaintiff is not entitled to recover, no matter how grievously he may have been injured.

In determining the weight of evidence, we should take into consideration the inherent probabilities of the case, the relative likelihood of the two stories. Here are two distinct theories of this accident. In the one case there is absolutely no liability on the part of the defendant, while in the other the liability of the defendant depends solely upon the conduct of one of its servants, in which the servant must have violated his duty not only to the plaintiff, but to the defendant, for it may not be assumed that the defendant ever authorized, even by implication, the commission of a crime, and the conduct alleged against the defendant's conductor is nothing less than, a crime. The evidence produced by the plaintiff has all of the "stage settings" to bring it within the rule of liability laid down by the courts, but is lacking in that naturalness which accompanies entirely credible testimony. The witnesses testify with a sameness which might suggest careful preparation to meet not only the rule of liability, but the past criticisms of the courts in similar cases. The plaintiff has a vital interest in this case. His only hope of securing a large sum of money from the defendant is to establish that, while he was himself engaged in the commission of a crime, the defendant's servant, by a higher crime, inflicted the injuries which he has sustained, and his principal supporting witness is his companion in that crime. Looking into the probabilities, we have the testimony of the plaintiff and his companion that they had never had any difficulty with the defendant's conductor; that they had never seen him up to the very moment of the alleged assault, so that it must be evident that the only motive he could have had for committing any kind of an assault upon the plaintiff was the fact that the plaintiff was trying to steal a ride. No words were exchanged, according to the testimony of the plaintiff and his companion, and under such circumstances it may be said that men do not usually assault boys of the age of the plaintiff. With more than half of a century of active railroad experience in this state, the instances in which assaults of this nature have been committed are very rare, if we may judge from the adjudicated cases, and in none of them have the circumstances been of an equally dangerous character. In the most of the cases which have been decided the servants committing the assault have kicked or pushed the plaintiff off of the platform of a moving train, or have thrown missiles at the trespasser, but here we are told that the plaintiff was between two cars of a long train, moving at the rate of 12 to 15 miles per hour, and where a fall was almost certain to produce death, and we are asked to believe that the defendant's conductor, not only kicked at the plaintiff, but that he persisted in kicking the plaintiff's knuckles until he was obliged to let go with both hands, an act of brutality so gross and unnatural, so full of criminal disregard for the life of his fellow men, that it would be difficult to believe the testimony if it were entirely undisputed. A man under a sudden impulse might kick at a trespasser once. He might push him off from a platform of a moving car, unmindful of the danger, but to brutally kick a boy loose from his hold, with full opportunity to anticipate the results, under the circumstances narrated

by the witnesses in this case, is quite another thing, and it is entirely inconsistent with the subsequent conduct of the defendant's conductor, who visited the boy's aunt after the accident to learn of his condition, and who repeatedly inquired after his welfare. We venture to say that in all the records of negligence cases within the state of New York no parallel case of brutality can be found, that no instance of like provocation and circumstances has ever resulted in a like wantonness on the part of the assailant; and, while this is not by any means conclusive upon the question here presented, it is important to be taken into consideration when dealing with a problem of probabilities. If the conductor had been annoyed by them, if they had had a previous experience with him, or he had any grievance against them, it might be probable that he would so far forget himself as to make an assault the probable effect of which was to produce a horrible death, but the evidence all disclaims any such condition. We are asked to believe that a wholly unprovoked assault, except as the plaintiff's trespass might have provoked it, was made upon this plaintiff, and that this assault was made under such circumstances, and with such a degree of persistence and brutality that it could have only the one purpose of precipitating the plaintiff to the track between these moving cars, and this story is so at variance with the usual conduct of men, so out of harmony with the experiences of mankind, that the evidence in its support ought to be of the most unquestioned character in order to carry conviction. Nothing much short of evidence which would fairly justify the conviction of the conductor of an assault in the first degree (section 240, Penal Law [Consol. Laws 1909, c. 40]) ought to prevail as against the defendant in this case, for its liability must depend upon the commission of this crime by its servant in the performance of his general duty of caring for the train under his charge. This story is told by the plaintiff himself, by one Curtin, his companion, who was likewise engaged in stealing a ride, by one Boyd, who described himself as being employed by a private detective agency to shadow people in actions for divorce and matters of that kind, and to some extent these are corroborated by witnesses originally called by the defendant, and subsequently put upon the stand in rebuttal by the plaintiff, and these witnesses appear to have been very carefully interviewed by the plaintiff's attorneys, though not called until after the defendant had been led to believe they would not be called by the plaintiff. It is rather remarkable that two witnesses should be called by both sides; particularly that the plaintiff should not have called them in making his case, though prompt to do so upon the rebuttal, and that their testimony should fit into the plaintiff's theory.

On the other hand, the theory presented by the defendant is entirely consistent with the everyday observations of intelligent men. It does not impose any undue burden upon our credulity. It does not call for any presumption of crime or cruel or unusual conduct on the part of any one, except in so far as it is a crime for individuals unconnected with the railroad to trespass upon the cars of the company. No man who has had occasion to be in the presence of an operating railroad has failed to observe the almost hourly trespasses of boys and

young men upon freight trains, and many of them have witnessed accidents of almost identical circumstance with that described by the defendant's witnesses, some of them absolutely disinterested, and whose credibility is in no wise impeached. The story is told simply by one Samuel Lundquist, an employé of an extensive manufacturer of metallic doors and interior finishings, known as the Dahlstrom Metallic Door Company, who says that he was in the vicinity of the railroad track at 129th street and saw the accident; that his wife was with him at the time; that they had come down to the river to watch the fishermen, or, rather, that they were on their way there; that the train came along just as they came to the crossing of 129th street; that the train in passing was running at the rate of 12 or 15 miles an hour; that he noticed one boy get on the front part of the train, and that he saw the plaintiff running alongside of the train; that the plaintiff was apparently waiting to catch the handle bar and a smaller boy ran in ahead of him; that the two boys collided; that the plaintiff fell down, and his feet went under the wheels; that the other boy ran away; that the witness ran over and got hold of the plaintiff's shoulders to keep him from going under the train; that he held him there until the train passed and another man came from the other side of the train, and helped to carry the plaintiff to Riverside Drive Park, where he stayed until the ambulance came; that the first boy got on at the front of the train and the accident happened about one-third of the way down the train; that the other two boys, the plaintiff and the small boy, were running, the small one in front; that the plaintiff was running, looking back at the train; that he was running in the same direction as the train, looking back over his shoulder; and that he then came in collision with the small boy. Lundquist's wife corroborates him in this story. She says she noticed several boys; that they were running toward the train. The other boys left and two boys were attempting to board the train. The boy that was injured ran across the tracks in the same direction as the train, looking towards the back of the train, and the other boy ran across the tracks and started in ahead of the boy. The plaintiff overtook the boy, and they collided. The smaller boy had knickerbockers on. The Carmody boy, the plaintiff, stumbled over this boy and his feet went right under the train. His feet went under the wheels, and the first wheel of the last truck went over him. Then he jerked his feet from under the train. As summarized in appellant's brief:

"I ran down to help carry the boy. My husband took hold of his shoulders. I took my husband's cane and ran across the track. There was an old man standing there smoking a pipe. I asked him to go over and help my husband carry the boy, and he didn't say a word. I then went back to the accident, and some men from the other side came and helped my husband."

This testimony was not shaken in the least upon cross-examination, though the plaintiff's counsel attempts to make much of the fact, admitted by the witness Lundquist, that some time during the past three years the Dahlstrom Metallic Door Company, his employer, had sold some metal furniture to the New York Central Railroad Company, the amount being about $100,000, and that the witness had stated in a general way that he wanted to protect the defendant against this ac-

tion. Why not desire to defend the defendant against this action, if the facts are as he states them? Why should any honest man have any other desire, if the plaintiff was injured in the manner stated? This witness says that he told plaintiff's attorney these facts substantially as he stated them in court, and offered to convince the attorney that he had no cause of action against the defendant, if the attorney would accompany him to the scene of the accident, and that the attorney subsequently went with him to the place, and that photographs were taken. The attorney did not dispute this, though present in court upon the trial, and there was an abundance of opportunity, knowing the truth, to fix up a case in partial harmony with the facts, and at the same time bring the case within the rule of liability. Some one has certainly committed perjury in this case. Either the plaintiff and his witnesses have testified to an absolute falsehood in reference to the conduct of the defendant's servant, or Mr. and Mrs. Lundquist, with no legal interest in the controversy, have perjured themselves in an effort to protect a corporation, in which they have no interest, against this most unfortunate young man. Nothing in the trial tends to show them to be unworthy of belief, or to have any motive in the matter other than to do their plain duty and to tell the story of the accident as they saw it. They tell the simple story of an act which is familiar to all of us; one which is in accord with our common experiences, and which does not involve the incredible brutality of a single human being; one which is so likely to happen that we scarcely pause to comment when the story is told, and, if the case presented no other testimony, it would be difficult to conclude that these people, walking down to the river for the innocent purpose of watching the fishermen, could be induced to commit a crime, where no evidence whatever is given to show that there was any inducement therefor. People do not, as a rule, commit perjury for the sake of wronging an unfortunate brother, where there is no greater inducement than the fact that a corporation has in the past purchased a bill of goods of the witness' employer, while many reasonably honest people have been known to color their testimony, not to call it by a harsher name, out of sympathy for the injured one.

But in addition to the testimony of Mr. and Mrs. Lundquist, which is corroborated in many of the incidents by witnesses called by the plaintiff, the conceded facts in connection with the accident are so inconsistent with the story told by the plaintiff and his witnesses that we cannot help believing that the jury must have failed in the discharge of its duty to weigh the evidence. All of the witnesses who pretend to have any recollection about the matter agree that the train stopped within 200 feet of the crossing of 129th street, where the accident occurred. The defendant's engineer testified that the train came to a stop without any action on his part, through the operation of the air brakes. The defendant's head brakeman, who was upon the engine, testified to the same effect, and so did the fireman. So we have two facts which are not disputed by evidence—one that the train stopped near the crossing, the other that this came from the operation of the air brakes apart from any action on the part of the defendant's engineer. Then we have the testimony of the defendant's conductor

that he handed off a bill of lading from the caboose of the train, 41 cars long, as he passed 136th street, and that he did this is not disputed, and that he then went to the cupola of the caboose at the rear of the train and took his position there to watch over the train, as was his duty, and that as the caboose passed over 129th street he heard somebody "holler," and that he felt that something was wrong, and that he reached for the air break valve to stop the train, and that, as he did so, the rear brakeman, whose place of duty was likewise in the cupola, reached for the same valve, and that the two of them, acting simultaneously, operated the valve and stopped the train. The rear brakeman testifies to the same state of facts, only he says that the "holler" was rather more definite; that he heard some one crying that a man had been hurt, or something to that effect, as he grabbed for the valve lever, and this the learned trial justice suggests is absurd and unreasonable. But it is hardly remarkable that the witness should have thought he heard this cry. He may have heard it, or it may have been the impression the cry made upon his mind, or the exact words he uses may have been uttered so near to the time of his action that he confused it with the act, or the cause of the act. A cry of pain is usually distinct. Some one has aptly said that "no one ever cries, 'Fire!' in the wrong tone of voice," and with such a cry in his ears the rear brakeman probably did not stop to distinguish words, but reached instinctively for the air brake valve, and the mere fact that he formulated the cry differently from what would suggest itself to the mind of a trial justice does not tend materially to weaken his testimony as to the material fact that both the witness and the defendant's conductor were present in the cupola of the caboose at the moment of the accident; that the train was stopped by the joint action of the conductor and the witness, in full harmony with the testimony of the defendant's engineer, head brakeman, and the fireman that the train stopped by the air brakes operated elsewhere than in the engine. Moreover, the evidence is undisputed that the rules of the railroad did not require the conductor to keep watch to prevent trespassers upon the train, except when the train was standing still, that the rules required the trainmen to keep off of the tops of the cars, as there was no duty calling them there while the train was in transit, and there was danger from low bridges. Add to this the fact that it was undisputed that the conductor was upon the caboose as the train passed 136th street, that the train was 41 cars in length, 7 gondola or low cars being sprinkled through the train, and each car varying in length from 36 to 40 feet, it will be seen how impossible it would have been for the conductor to reach the point testified to while this train running at the rate of 12 or 15 miles an hour was running 7 blocks. It may be doubted whether this would be possible if all of the cars were of the same height, but when it is known that there were 7 low cars interspersed between the high cars, thus necessitating climbing at intervals, the story becomes absurd for the plaintiff's testimony is to the effect that the assault occurred at the rear end of the third car from the engine, or about 1,440 feet from the caboose. In other words, the defendant's conductor in the natural and ordinary discharge of his duties would be doing just what he says he was doing.

He would be delivering the waybill at 136th street and taking his place in the cupola of the caboose while the train was running to its next stopping place at 72d street, and every member of the train crew testifies in harmony with this situation, and the only conflict in the evidence makes it impossible for the conductor to discharge his duty of handing off the waybill at 136th street—and that he did this is undisputed—and takes him over at least 38 cars, some of them far below the others in height, and where no duty called him, and compels him to commit a crime of almost unparalleled brutality, that the plaintiff may succeed in this action. If this is sustaining the burden of proof, then we are unable to appreciate the elements that go to make up weight in evidence.

[2] While it can hardly be said that the positive evidence of all the operatives of the train on the day in question stands uncontradicted and unquestioned, and must therefore be accepted as true, that the jury could not reject it on the ground that they were in the employ of the defendant, as was held in the case of Johnson v. N. Y. C. & H. R. R. R. Co., 173 N. Y. 79, 83, 65 N. E. 946, we do feel that the conceded circumstances surrounding the accident are so in harmony with the testimony of the defendant's employés, who had no legal or pecuniary interest in the controversy (Johnson v. N. Y. C. & H. R. R. R. Co., supra), that the evidence offered in support of the plaintiff's claim cannot be fairly said to preponderate in favor of the latter; that it was of that substantial and trustworthy character which should permit it to prevail over the unimpeached testimony of absolutely disinterested witnesses. The plaintiff and his witnesses testify to a highly improbable story, to an exhibition of brutality rarely equaled in civilized communities, in which the principal actor is called upon to traverse nearly the whole length of a long freight train, where no duty called him, in an impossible length of time, if we assume the truth of his uncontradicted testimony that he was upon the caboose and delivered a paper from the moving train at 136th street, and the witnesses in support of this proposition are the plaintiff's lawless companion in the trespass, an employé of a private detective agency engaged in securing divorce evidence, a life-saving station employé, who might easily be mistaken in reference to the facts which he details, and a former employé of the defendant, who was either false to his employers at the time of the accident or is false now in the testimony which he gives. Opposed to this testimony is the highly probable story of Mr. and Mrs. Lundquist that the plaintiff was tripped by coming in contact with another boy while engaged in an effort to board the train while it was going at the rate of 12 to 15 miles per hour, and their testimony is entirely in harmony with that of the entire train crew as to the location of the conductor at the time of the accident. The verdict is against the clear weight of evidence, and the defendant's motion to set aside the verdict should have been granted.

[3] It does not seem necessary to discuss particularly the defendant's motion for a new trial on the ground of newly discovered evidence. It may be that the defendant was not as diligent as the case, as presented by the plaintiff upon the trial, would warrant, but, in

view of the defendant's information, it was hardly to be expected that the plaintiff would develop the theory which the testimony discloses, and it was not strange, therefore, that all of the evidence which might have been brought to controvert it was not produced. Under the liberal rule suggested by the court in cases of this character (Barrett v. N. Y. C. & H. R. R. R. Co., 157 N. Y. 663, 667, 52 N. E. 659), it would seem that the defendant was fairly entitled to the benefit of the newly discovered evidence, even though it might be said to be cumulative.

The judgment and orders appealed from should be reversed and a new trial granted, costs to abide the event.

JENKS, P. J., and CARR and RICH, JJ., concur. THOMAS, J., concurs in result.